FILED
CLERK

5/30/2019 12:37 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

For Online Publication Only

KRISTIN ZOLL,

                    Plaintiff,

   -against-                           **MEMORANDUM AND ORDER**
                                           16-CV-2063 (JMA) (AYS)

NORTHWELL HEALTH, INC.,

                    Defendant.

-----------------------------------------------------------X

**APPEARANCES:**

Robert L. Levy and Sherie Nan Buell
Bantle & Levy LLP
817 Broadway
New York, New York 10003
      *Attorney for Plaintiff*

Christopher G. Gegwich and Tony Garbis Dulgerian
Nixon Peabody LLP
50 Jericho Quadrangle, Suite 300
Jericho, New York 11753
      *Attorney for Defendant*

**AZRACK, United States District Judge:**

      Plaintiff Kristin Zoll ("Plaintiff") filed the instant action against her former employer, Northwell Health, Inc. ("Northwell" or "Defendant") alleging intentional discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq. (the "Complaint", ECF No. 1.) The Court referred Defendant's motion for summary judgment (ECF No. 42) to the Honorable Anne Y. Shields, who issued a report and recommendation (the "R&R") recommending that the motion be granted in part and denied in part. (ECF No. 52.) Both parties filed timely objections to the R&R. (ECF Nos. 54, 55-9.) For the reasons stated below, the Court finds that Defendant is entitled to summary judgment concerning Plaintiff's claims that

her termination was discriminatory and retaliatory. As explained further, <u>infra</u>, the Court defers ruling on Plaintiff's claim that the extension of her probationary period was discriminatory and invites the parties to submit supplemental briefing on that claim.

## I. BACKGROUND

Familiarity with the R&R, the parties' objections, and underlying motion papers is assumed. However, the Court will briefly recite the central facts of the case.

Plaintiff, who is Caucasian, was employed at Northwell from January 9, 2012 through January 23, 2015, when she was terminated. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 16–17, 236.)

For the first two and a half years of Plaintiff's tenure at Northwell, she worked as a social worker at both North Shore University Hospital and then Northwell's Transplant Center (the "Transplant Center"). (<u>Id.</u> ¶¶ 17, 29–31, 38–40.) In June 2014, Plaintiff applied for, and was ultimately hired for, the position of Manager, Marketing and Education for the Transplant Center. (<u>Id.</u> ¶¶ 38–40.) In this role, Plaintiff's "job duties included seeking out and scheduling appointments with local dialysis centers and coordinating presentations to market the services of the Transplant Center," which included educational presentations. (<u>Id.</u> ¶¶ 51–52.) Northwell characterized this change in Plaintiff's employment as a "transfer" and, as a result, Plaintiff was placed on a probationary assessment period beginning June 30, 2014. (<u>Id.</u> ¶¶ 24, 40, 47.)

On October 27, 2014, approximately four months after Plaintiff assumed her new role, Christine Palms ("Palms") was hired for the role of Assistant Vice President, Transplant Program, and became Plaintiff's supervisor. (<u>Id.</u> ¶¶ 61, 65, 67.) Plaintiff alleges that Palms, who is Black, favored Black and Latino employees over Caucasian ones, and subjected Plaintiff to discrimination that culminated in Plaintiff's termination. (<u>See generally</u>, Pl.'s Mem., ECF. No. 44-1.)

As part of this alleged discrimination, Plaintiff claims that Palms did not adequately

supervise her, including failing to substantively meet about Plaintiff's job responsibilities until mid-December 2014. (Id. at 7–8.) The parties agree that on December 12, 2014, Palms, together with Celenia Reynoso ("Reynoso"), the Administrative Manager of the Transplant Center, met with Plaintiff. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 68, 120–21; Sealed Palms Decl., ECF No. 43-4, Ex. H.) The parties disagree about the full extent of what was discussed in the meeting but agree that moving forward, Plaintiff was to assume responsibility for conducting educational presentations at outreach events, after observing 2 to 3 more lectures and presenting to administrative leadership. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 128–29; Sealed Palms Decl., ECF No. 43-4, Ex. H.) They also discussed Plaintiff's time-accountability with Palms instructing Plaintiff to inform Palms or Reynoso whenever she was away from the office and to copy Palms and the office calendar on all outreach events. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 126–27; Sealed Palms Decl., ECF No. 43-4, Ex. H.) Palms also recommended that whenever Plaintiff left her station at outreach events, she leave a sign detailing her return time.[1] (Id.)

However, there is a factual dispute about whether Plaintiff was aware that she could or should have been making educational presentations prior to December 2014. Plaintiff contends that Nicole Ali, M.D. ("Dr. Ali"), the Medical Director of the Transplant Center, refused to allow a non-physician to conduct educational presentations prior to December 2014, but Dr. Ali asserts that she informed Plaintiff in mid-2014 that Plaintiff should be conducting these educational presentations on her own and Plaintiff never took any steps to do so. (See Rule 56.1 Stmt., ECF No. 44, ¶¶ 52–59, 117–19; Ali Decl., ECF No. 42-4, ¶¶ 9–11; Zoll Decl., ECF No. 44-6, ¶¶ 40–

---

[1] Plaintiff "denies" the assertions about the specifics of the time accountability discussion in her Rule 56.1 statement, with a blanket response that they discussed "time-leave/time-management issues." (Rule 56.1 Stmt., ECF No. 44, ¶¶ 126–27.) However, Plaintiff refers to these recommendations in her deposition and declaration. (See Zoll Decl., ECF No. 44-6, ¶¶ 21–22, 34; Dulgerian Decl., ECF No. 42-3, Ex. E ("Zoll Dep."), 94:17–96:5.) And Palms' notes from the meeting identify the same recommendations. (Sealed Palms Decl., ECF No. 43-4, Ex. H.) Accordingly, there is no factual dispute concerning these recommendations.

43.) Regardless of this factual dispute, coming out of the December 2014 meeting, Plaintiff agreed to work towards assuming responsibility for conducting the educational presentations at outreach events. Although it is unclear whether Plaintiff scheduled any educational presentations after this meeting, she did not present any prior to her termination. (See Rule 56.1 Stmt., ECF No. 44, ¶ 133.)

On January 16, 2014, the Transplant Center received a letter dated January 14, 2014 (the "Complaint Letter") from an individual who claimed to have interacted with Plaintiff at the Freeport Dialysis Center. (Sealed Palms Decl., ECF No. 43-4, Ex. I). The Complaint Letter stated, in relevant part:

> I was picking up my family member at the Freeport dialysis unit on Tuesday [*sic*] you had a Representative from your office. I wanted to get information only to see her sitting on the phone arguing and crying. Asking me to give her a moment. I didn't have 15 min to hear her sobbing and arguing over a dog and gentleman not doing his share after they separate. . . . She insisted on me giving her a minute reassuring me that it was a call from her office that she really need [*sic*] to handle it. Sure! I Didn't know you have dogs and make your employees cry. or [*sic*] Handed me your office business card. I was extremely annoyed and got discourage [*sic*] from going to your office.

(Id.) The Complaint Letter does not mention Plaintiff by name, but Plaintiff, who owned a dog, was the only representative from the Transplant Center at the Freeport Dialysis Center on January 13, 2015. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 143, 162.) The Complaint Letter was also sent to Michael Dowling, the President and CEO of Northwell, and Dr. Alessandro Bellucci, the Executive Director of North Shore University Hospital. (Id. ¶ 146; see Sealed Palms Decl., ECF No. 43-4, Ex. I (including Dowling and Bellucci in the CC field of the Complaint Letter).)

Following receipt of the Complaint Letter, on January 18, 2015, Dr. Ali emailed Debra Bierman ("Bierman"), the Associate Executive Director of Human Resources, expressing that "Outreach is extremely important to our program's growth. The interaction that this writer describes is quite concerning." (Sealed Ali Decl., ECF No. 43-2, Ex. B.) She explains "[w]e are

all very concerned about the issues and interactions reported in this letter and need to take quick action to avoid further similar negative experiences for our patients. . . ."  (Id.)

Palms and Reyniso met with Plaintiff on January 20, 2015 to notify her about the Complaint Letter, but did not show her the contents of the letter.  (Rule 56.1 Stmt., ECF No. 44, ¶¶ 174–78.)  Plaintiff denied the allegations in the Complaint Letter.  (Id. ¶¶ 179–81.)  Thereafter, Palms, in consultation with other officials at Northwell, decided they needed to remove Plaintiff from outreach activities.  (Id. ¶ 183.)  On January 21, 2015, Palms, Dr. Ali, and Erin Nichols ("Nichols"), the site Human Resources representative for the Transplant Center, met to discuss Plaintiff.  At that meeting, Palms and Dr. Ali indicated they were considering terminating Plaintiff's employment.  (Id ¶¶ 109, 184, 189.)  Palms and Reyniso then met with Plaintiff to inform her of the decision to remove her outreach activities until further notice.  (Id. ¶¶ 193–94.)  Plaintiff continued to deny the allegations in the Complaint Letter.  (Id. ¶¶ 196–97.)

Plaintiff went to Nichols on January 22, 2015 and expressed that she felt Palms and Reyniso were trying to have her fired.  (Id. ¶¶ 198–99.)  Nichols asked Plaintiff for her side of the story regarding the Complaint Letter.  (Id. ¶¶ 201–02, 207–09.)  At her deposition, Nichols testified that she did not find Plaintiff's explanations credible.  (Dulgerian Decl., ECF No. 42-3, Ex. I, 215:10–216:21.)  Plaintiff also claims that she complained to Nichols about being subject to unfair treatment by Palms and Reyniso, but in her deposition, Plaintiff would not confirm that she expressed to Nichols that she was being subjected to *race* discrimination.  (Rule 56.1 Stmt., ECF No. 44, ¶ 198; see Dulgerian Decl., ECF No. 42-3, Ex. E ("Zoll Dep.") 145:4–148:13.)

The next day, January 23, 2015, Palms and Reyniso met with Plaintiff again and this time notified her that Northwell had decided to terminate her employment.  (Rule 56.1 Stmt., ECF No. 44, ¶ 236.)  Palms provided Plaintiff with written notice of the decision, which stated that she was

terminated because she failed to pass probation.[2]  (Id.; Sealed Palms Decl., ECF No. 43-4, Ex. K.)

Plaintiff called Nichols later that day to assert that her termination was unfair, and on February 4, 2015, Plaintiff met with members of Northwell's Human Resources Department and alleged that she was subject to racial discrimination by Palms and Reynoso.  (Rule 56.1 Stmt., ECF No. 44, ¶¶ 242, 244–61.)  Northwell subsequently investigated Plaintiff's claims of race discrimination in the Transplant Center and determined that Plaintiff's allegations were without merit.  (Id. ¶¶ 265–66, 273–81.)  Plaintiff was informed of the result of the investigation on March 4, 2015.  (Id. ¶ 282.)

Approximately six months later, on September 3, 2015, Plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC") alleging that her termination was motivated by Palms' (and Reynoso's) racial animus.  (Sealed Dulgerian Decl., ECF No. 43-1, Ex A.)  Plaintiff did not make any reference to her meeting with Nichols on January 22, 2015, allege that her termination was retaliatory, or check the "Retaliation Box" of the Intake Questionnaire.  (Id.)  The EEOC sent Plaintiff a Dismissal and Notice of Rights on February 1, 2016, and she commenced the instant action on April 26, 2016.  (Id., Ex B; Compl., ECF No. 1.)

## II.  DISCUSSION

### A.  Applicable Standards

In reviewing a magistrate judge's report and recommendation, the court must "make a *de novo* determination of those portions of the report or . . . recommendations to which objection[s][are] made."  28 U.S.C. § 636(b)(1)(C); see also Brown v. Ebert, No. 05–CV–5579, 2006 WL 3851152, at *2 (S.D.N.Y. Dec. 29, 2006).  The court "may accept, reject, or modify, in

---

[2]  Plaintiff alleges she should not have been on probation at this time because her probationary assessment period expired six months after her transfer, on December 30, 2014.  (Pl.'s Mem., ECF No. 44-1, at 5–6.)  The length of Plaintiff's probationary assessment period is discussed in more depth in Section II.C, infra.

whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Those portions of a report and recommendation to which there is no specific reasoned objection are reviewed for clear error. See Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008). Here, the parties objected to all the conclusions reached by Magistrate Judge Shields in the R&R. Accordingly, the Court has considered the entire R&R de novo.

Applying a de novo review of the record, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The

nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise summary judgment is appropriate. Anderson, 477 U.S. at 249.

In a discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer. . . ." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Id. However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (alteration in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

## B. Plaintiff Failed to Establish Her Termination Was Discriminatory

### 1. Standard for a Discrimination Claim

Employers cannot "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); see also N.Y. Exec. Law § 296 (prohibiting employment discrimination on the basis of race, among other things). Claims of employment discrimination brought pursuant to Title VII and NYSHRL are analyzed under the familiar burden-

shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015) (noting that Title VII and NYSHRL discrimination claims are analyzed using the same framework). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010) (citation omitted). This means Plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83 (2d Cir. 2015).

"Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason" for the adverse employment action. Ruiz, 609 F.3d at 491. If the defendant meets this low bar, "[t]he plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). "'[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason" for the employer's decision. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). Accordingly, to defeat summary judgment, Plaintiff must prove that her race was a motivating factor behind her termination. Vega, 801 F.3d at 85.

Applying the McDonnell Douglas framework, Plaintiff cannot establish a discrimination claim based on her termination.[3] Drawing all permissible factual inferences in Plaintiff's favor, she meets the minimal prima facie burden. However, shifting the burden to the Defendant, Northwell also meets the very low burden of producing legitimate nondiscriminatory reasons for Plaintiff's termination. When the burden is ultimately shifted back to Plaintiff, she cannot prove that her race was in any way a motivating factor behind her termination.

### 2. Plaintiff Established a Prima Facie Case of Discrimination and Northwell Met its Burden of Producing Legitimate Non-Discriminatory Reasons for its Decision to Terminate Plaintiff

Plaintiff's burden at the prima facie stage is de minimis. See Weinstock, 224 F.3d at 42. Upon a review of the record, the Court concludes Plaintiff has established a prima facie case, albeit a weak one. The Court finds it unnecessary to identify exactly all the evidence that supports Plaintiff's initial burden, as the same evidence is discussed at length below in the pretext analysis. Notably, the fact that the role of Manager, Marketing and Education was ultimately filled by a non-Caucasian individual is likely sufficient to meet the low bar for raising a prima facie case of race discrimination. See Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis.").

However, Northwell identifies two legitimate non-discriminatory reasons for its decision to terminate Plaintiff. First, that Plaintiff was not taking steps towards assuming responsibility for conducting educational presentations at outreach events, and, second, the receipt of the Complaint Letter criticizing her conduct at an outreach event. (Def. Mem., ECF No. 42-2, at 15–16.) As

---

[3] Plaintiff alleges she was subject to a second adverse action—an extension of her probationary assessment period. The Court addresses that point in Section II.C, infra.

Defendant's burden "is one of production, not persuasion," Reeves, 530 U.S. at 142 (citations omitted), these reasons are sufficient to rebut the temporary presumption of discrimination arising from Plaintiff's prima facie case. See Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008). Accordingly, the burden shifts back to Plaintiff to show "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [Plaintiff] was based, at least in part, on" her race. Id.

### 3. Plaintiff Cannot Show Northwell's Reasons for Her Termination were a Pretext for Race Discrimination

Once the burden shifts back to Plaintiff, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. In other words, it is not enough . . . to *dis* believe the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." Reeves, 530 U.S. at 146–47 (citations omitted) (alternation in original). Again, Plaintiff bears the burden of identifying evidence that would permit a reasonable jury to find in her favor. See id. at 143. Here, examining the evidence in the light most favorable to, and drawing all inferences in favor of, Plaintiff, no reasonable jury could find that Northwell's decision to fire her was in any way motivated by her race.

### a. A Reasonable Jury Might Question One of Northwell's Proffered Reasons for Terminating Plaintiff

Plaintiff attacks the veracity of Northwell's reasons for her termination. Specifically, she vehemently contests the truth of the allegations in the Complaint Letter and generally argues that it is not reliable. "In a discrimination case, however, we are decidedly not interested in the truth of the allegations against [P]laintiff. We are interested in what *motivated* the employer, the factual validity of the underlying imputation against the employee is not at issue." McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (citations omitted) (alteration in

original).  Plaintiff's contention that the Complaint Letter, on its own terms, failed to provide an adequate basis for her termination is illogical, and insufficient to show pretext.  And there is simply no evidence that Northwell did not in fact rely on the concerning conduct described in the Complaint Letter in deciding to terminate Plaintiff.[4]

The record is less clear surrounding Northwell's other reason for Plaintiff's termination: that Plaintiff did not schedule educational presentations at outreach events after the December meeting, and thus was not taking steps towards assuming responsibility for eventually conducting these presentations.  At the December 12, 2014 meeting with Palms and Reynoso, Plaintiff agreed she would take on the responsibility of making these presentations at the outreach events and indicated that the "plan moving forward was for her to observe 2 to 3 more lectures and present to administrative leadership before providing lecture[s] on her own."  (56.1 Stmt., ECF No. 44 ¶¶ 128–29.)

As discussed previously, there is a factual question about whether, prior to this meeting, Plaintiff was aware she could or should be making the educational presentations at outreach events, or whether she was told a doctor had to make them.  See Section I, supra.  There are also some discrepancies between Palms' deposition, where she testified that Plaintiff's failure to *conduct* the educational presentations contributed to the decision to terminate Plaintiff, (see Dulgerian Decl., ECF No. 42-3, Ex. H ("Palms Dep."), 274:6–17, 322:15–323:22), and her declaration, which asserts that Plaintiff's failure to *schedule* educational presentations at outreach events after the December meeting was the concern.  (Palms. Decl., ECF No. 42-6, ¶ 40.)  Plaintiff attempts to

---

[4] Similarly, Plaintiff's assertion that Northwell did not properly investigate the Complaint Letter does not demonstrate pretext or defeat summary judgment because she has offered no evidence that it was conducted in bad faith or based on discriminatory animus.  See Kolesnikow v. Hudson Valley Hosp. Ctr., 622 F. Supp. 2d 98, 112 (S.D.N.Y. 2009) (finding complaints about the adequacy of an investigation cannot show pretext "in the absence of evidence that Defendants acted in bad faith, failed to follow their ordinary disciplinary procedures or treated other employees differently").

make much of this alleged discrepancy, arguing that the Court should not even consider Palms'
Declaration on this point and that it shows that Palms lied at her deposition. (See Pl.'s Mem., ECF
No. 44-1, at 20–22.) Plaintiff also asserts that she cannot be faulted for failing to conduct
educational presentations by mid-January because the plan was for her to observe 23 presentations
and speak to administrative leadership before she conducted any herself. (See id., at 17–18.)

Given the relatively short amount of time between the December 12, 2014 meeting, and
Northwell's decision to remove Plaintiff from outreach on or around January 20, 2015, (Rule 56.1
Stmt., ECF No. 44, ¶¶ 182–84), coupled with the aforementioned factual questions, perhaps a
reasonable juror could question Defendant's purported reliance on Plaintiff's failures concerning
the educational presentations.[5] In any event, as explained below, even assuming a reasonable juror
could question the legitimacy of this reason, Plaintiff still cannot survive summary judgment.
There is still no evidence that Northwell's reliance on the Complaint Letter is at all pretextual,
which could itself entitle Defendant to summary judgment. See Reeves, 530 U.S. 133, 148 ("[A]n
employer would be entitled to judgment as a matter of law if the record conclusively revealed some
other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak

---

[5]    It is a close call whether a reasonable jury could conclude that Palms' purported concern over Plaintiff's failure
to take steps towards conducting educational presentations was pretextual. Plaintiff does not dispute that it was always
part of her job responsibilities to schedule educational presentations at outreach events, which Palms confirmed at her
deposition. (Palms. Dep. 179:6–12.) And, any failure to schedule educational presentations is intertwined with
Plaintiff's failure to ultimately conduct such presentations on her own. Palms' Declaration, which Plaintiff contends
should be disregarded, merely explains that Plaintiff's failure to "take any steps after [the] meeting to further the
agreed upon goal that she conduct[] educational presentations on her own" contributed to her termination. (Sealed
Palms Decl., ECF No. 43-4 ¶ 40.)

   Moreover, there is no clear evidence that Plaintiff took any actions after the December 12, 2014 meeting to meet
her goal of conducting educational presentations. While Plaintiff claims that she did schedule two educational
presentations in December 2014 and four in January 2015, (see Rule 56.1 Stmt., ECF No. 44 ¶¶ 133–34), her
declaration does not attest to that fact, and the chart she cites only identifies the existence of *outreach* events in
December 2014 and January 2015. (See Zoll Decl., ECF No. 44-6; Sealed Zoll Decl., ECF No. 45-3, Ex. 5.) The
only evidence that there were educational presentations at any of these December/January outreach events is Plaintiff's
testimony that an educational presentation was scheduled at a January 13, 2015 Freeport outreach event that Dr. Ali
ultimately cancelled. (Zoll Dep. at 105:3–18.) It is unclear whether the Freeport educational presentation, or any of
the December/January outreach events were scheduled before or after the December meeting.

13

issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). More critically, Plaintiff cannot satisfy her burden to show that a reasonable jury could find by the preponderance of the evidence that the educational presentation reason, even if pretextual, was a pretext for race discrimination.

Plaintiff also alleges that Palms (1) lied about the circumstances of Plaintiff's termination in her deposition and (2) violated procedure in terminating Plaintiff, asserting that this evidence further establishes pretext. (Id. at 20–23.) However, the purported conflicts that Plaintiff identifies in Palms' testimony are either not contradictory or not probative of discriminatory intent when viewed as part of the record as a whole.[6] Moreover, as discussed in Section II.C, infra, while there is some conflicting evidence about the procedures surrounding the probationary assessment period at Northwell, the slight departure from policy would not, under all the circumstances here, be enough for a reasonable jury to find that Palms terminated Plaintiff because of her race. See Chen v. Suffolk Cty. Cmty. Coll., 2017 WL 2116701, at *12 (E.D.N.Y. Mar. 31, 2017) aff'd 734 F. App'x 773 (2d Cir. 2018) (noting that departures from procedure, without more, do not show that an employer was motivated by racial discrimination). Accordingly, none of this evidence supports Plaintiff's assertion that Northwell's proffered reasons for her termination were pretextual.

### b. No Reasonable Jury Could Find That Northwell's Proffered Reasons to Terminate Plaintiff were a Pretext for Race Discrimination

Even if there is some evidence that would allow a jury to question one of Northwell's reasons to terminate Plaintiff, considering the overall record, Plaintiff cannot defeat summary

---

[6] As discussed, the slight disparities in Palms' deposition testimony and Declaration concerning the educational presentation issue ultimately carry no weight regarding Palms' motivation to terminate Plaintiff. The same goes for Plaintiff's assertion that Palms placed the decision to terminate Plaintiff on Dr. Ernesto Molmenti in her deposition, but then indicated that she decided Plaintiff's employment should be terminated in her Declaration. (Pl.'s Mem., ECF No. 44-1, at 20–21.) Indeed, Palms testified that she was part of the group of individuals who decided to terminate Plaintiff, and neither her Declaration nor Dr. Molmenti's deposition testimony contradicts this testimony.

judgment.  See James v. New York Racing Ass'n, 233 F.3d 149, 157 (2d Cir.2000) (holding that although the plaintiff satisfied the minimal standard for a prima facie case and offered evidence that arguably would allow a factfinder to conclude that an employer's explanation was false, summary judgment was appropriate because the evidence was insufficient to show that discrimination was a reason for discharge).  Indeed, all of Plaintiff's allegations of discrimination have little-to-no probative value, and when considered together, would not allow a reasonable jury to find that racial discrimination was a motivating factor in Plaintiff's termination.

Plaintiff admits that "[n]o one at Northwell ever made any negative or derogatory comments or statements to [her] regarding her Caucasian race."  (Rule 56.1 Stmt., ECF No. 44, ¶ 306.)  Instead, Plaintiff argues that there is enough other circumstantial evidence to support her claim that her supervisor, Palms, discriminated against her because of her Caucasian race, which purportedly leads to the conclusion that her termination was motivated by racial discrimination. Plaintiff identifies the following pieces of evidence in her motion papers to support this contention:

1. Palms was dismissive of third-party complaints against non-Caucasian employees, but terminated Plaintiff based on a third-party complaint;

2. Palms strictly scrutinized Plaintiff's compliance to workplace rules, while being "highly permissive" of non-Caucasian employees;

3. Palms denied Plaintiff "meaningful supervision," despite allegedly meeting with non-Caucasian staff "with regularity";

4. Palms was dismissive of Plaintiff in the workplace, failing to say hello or goodbye to Plaintiff, or engage in conversation;

5. Palms subjected other Caucasian employees, specifically Marlene Goldstein ("Goldstein") and Barbara Cascone ("Cascone"), to unfavorable treatment based on their race; and

6. Other Caucasian employees were terminated or forced to leave the Transplant Center by Palms and all new hires were non-Caucasian employees.

(Pl.'s Mem., ECF No. 44-1, at 7–10.)[7]

Accordingly, Plaintiff's claim of discrimination is that she, together with other Caucasian employees, was treated differently than non-Caucasian employees which she asserts supports a finding of "race-based disparate treatment in the workplace." (Pl.'s Opp., to Def.'s Obj., ECF No. 58, at 6.) The Court considers Plaintiff's claims of "disparate treatment," together with the other evidence in the record, to assess if a reasonable jury could find that Palms engaged in intentional discrimination against Plaintiff. (See Oral Argument Tr., ECF No. 51, 21:2–22:13.) Considering each piece of evidence in context, and then stepping back to view the evidence overall, no reasonable jury could find in favor of the Plaintiff.

Critically, Plaintiff has not shown that Palms treated her differently than other similarly situated employees. "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct. . . . In other words, the comparator must be similarly situated to the plaintiff in all material respects." Ruiz, 609 F.3d at 493–94 (internal citations omitted).

Plaintiff identifies no non-Caucasian employee at the Transplant Center who was subject to a probationary assessment period and, thus, was "subject to the same performance evaluation and discipline standards" as Plaintiff.[8] Even ignoring the fact that Plaintiff was on probation, there is no indication that any non-Caucasian Transplant Center employee engaged in "comparable conduct." See Ruiz, 609 F.3d at 495 (finding that a plaintiff who failed to identify "a similarly-

---

[7] Any other purportedly discriminatory actions referenced in the Complaint were not raised in Plaintiff's motion papers and Plaintiff has thus waived her right to use them as possible pieces of supporting evidence.

[8] Plaintiff argues that "the Transplant Center's non-Caucasian employees are appropriate comparators for [her]" because Palms was the "ultimate supervisor and decision-maker" even though some employees were directly supervised by Reynoso who in turn was supervised by Palms. (Pl.'s Mem., ECF No.44-1, at 9–10.) The disparate treatment analysis would not end there because any comparator must be similarly situated to Plaintiff "in all material respects." Ruiz, 609 F.3d at 494.

situated employee who faced equally serious allegations" and was not terminated, "failed to raise an inference of discrimination").

### i. Alleged Disparate Treatment Regarding Third-Party Complaints

Plaintiff's evidence is insufficient to show that, in terminating her employment after the Transplant Center received a third-party complaint against her, Palms treated her differently than other similarly situated employees.

In support of this and other arguments, Plaintiff cites to her own Declaration and deposition, as well as the Declarations of Goldstein and Cascone,[9] which largely consist of conclusory assertions devoid of any specific examples. In her Declaration, Plaintiff alleges that "Palms routinely was dismissive of patient and family member complaints against African-American and Latino employees, satisfying herself with denials or contextual explanations by the accused employee." (Zoll Decl., ECF No. 44-6, ¶ 24.) Cascone also vaguely alleges that "Caucasian employees routinely were held accountable for third-party complaints without the opportunity to substantively respond, whereas complaints against African-American and Latino employees routinely were disregarded based on staff denials or explanations." (Cascone Decl., ECF No. 44-2 ¶ 18.) These vague and conclusory allegations fail to identify any specific third-party complaints, much less one against an identified non-Caucasian Transplant Center employee.[10]

By failing to identify any specific third-party complaint or the specific targets of such

---

[9] Both Goldstein and Cascone, who are Caucasian, worked at the Transplant Center during the relevant time-period. Goldstein worked as a Social Worker and Cascone worked as an Administrative Support Associate. (Goldstein Decl., ECF No. 44-3; Cascone Decl., ECF No. 44-2; see also Rule 56.1 Stmt., ECF No. 44, ¶ 69.)

[10] In her Declaration, Plaintiff alleges that Palms also discounted an explanation by Cascone regarding a third-party complaint letter referencing Cascone, but this again has little relevance without any specific evidence that third-party complaints against a non-Caucasian employees were treated differently. (See Zoll Decl., ECF No. 44-6, ¶ 26.) It is also notable that Cascone does not even corroborate Plaintiff's allegation on this point.

complaints, Plaintiff cannot demonstrate that any non-Caucasian employees were the subject of a third-party complaint that was comparable to the one against Plaintiff, which included allegations of inappropriate behavior towards the family member of a dialysis patient.  See Ruiz, 609 F.3d at 495 (finding that a plaintiff who failed to identify "a similarly-situated employee who faced equally serious allegations" and was not terminated, "failed to raise an inference of discrimination").  As such, this evidence does not support Plaintiff's claim of discrimination.

### ii.  Other Alleged Disparate Treatment Involving Plaintiff

Plaintiff also contends that she was treated differently in her day-to-day experience at the Transplant Center compared to non-Caucasian employees—i.e., in contexts not directly related to the Complaint Letter and educational presentation issues that Northwell maintains led to Plaintiff's termination.  Although such instances of allegedly disparate treatment can be relevant, as circumstantial evidence, to ultimately show intentional discrimination, none of the remaining allegations of "disparate treatment" cited by Plaintiff could permit a reasonable jury to infer discrimination.

The most specific allegation of "disparate treatment" is Plaintiff's claim that Hoshane Brown ("Brown"), who is Black and was an Administrative Support Associate, was regularly late and took long breaks while Plaintiff's time was closely scrutinized.  (Pl.'s Mem. ECF No. 44-1, at 8–9; see also Rule 56.1 Stmt., ECF No. 44, ¶ 69.)  However, Plaintiff and Brown were not similarly situated.  Plaintiff's position took her outside the office and required her to interact with potential patients and their families face-to-face, while Brown's position was within the Transplant Center.  Comparing Palms' desire to know about Plaintiff's whereabouts while out of the office, versus her apparent disinterest in Brown's, is like comparing apples to oranges.  And, critically, Plaintiff does not allege that she was terminated or disciplined in any way for violating Northwell's time-leave rules—so comparing herself to Brown in this way does not assist her discrimination claim.  Thus,

the fact that Plaintiff's supervisor wanted to know where she was during the work day when she was off-site is hardly evidence of discrimination. Nor could a reasonable jury find that Palms' other time accountability suggestions—such as Plaintiff leaving a sign on her desk at outreach events so potential patients knew when she was coming back to answer questions—were discriminatory.

Plaintiff further complains that, during the approximately three months she and Palms overlapped, Palms was unfriendly and did not actively supervise Plaintiff, but was friendlier and more open to non-Caucasian employees. (Pl.'s Mem., ECF No. 44-1 at 7–8.) These allegations are again vague and conclusory, and a reasonable jury could not find that that the minor instances Plaintiff describes evince any racially discriminatory animus by Palms or suggest that Plaintiff's termination was motivated by her race.

### iii. Alleged Disparate Treatment Involving Caucasian Employees

Plaintiff claims that Palms' treatment of other Caucasian employees provides "broader evidence of differential treatment" that supports an inference of discrimination. (Id. at 10.) The Second Circuit has recognized that an employer's discrimination against other employees might, in certain circumstances, be relevant to prove evidence of discriminatory intent in an individual discrimination case. See Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 149–50 (2d Cir. 2012) (recognizing the potential relevance of an employer's general pattern of discrimination in an individual case). However, allegations by other employees cannot be the primary basis of a plaintiff's case. See Alejandro v. New York City Dep't of Educ., No. 15-CV-3346, 2017 WL 1215756, at *12 (S.D.N.Y. Mar. 31, 2017) (noting that there is no authority to allow a plaintiff to establish a prima facie case based primarily "on *others*' unsupported allegations of harassment directed at *them*"); see also Baby v. Nassau Healthcare Corp., No. 14-CV-3297, 2017 WL 3278901, at *7 (E.D.N.Y. Aug. 1, 2017) (finding that reliance on weak evidence of

pretext and the circumstances surrounding the forced resignation of only one other employee in the same protected class is insufficient to defeat summary judgment).

Plaintiff primarily relies on the Declarations from Cascone and Goldstein to support this argument.[11] (Cascone Decl., ECF No. 44-2; Goldstein Decl., ECF No. 44-3.) As with Plaintiff's own conclusory and vague allegations concerning Palms' treatment of Plaintiff versus other non-Caucasian employees, the Cascone and Goldstein Declarations lack any specificity regarding how exactly they were treated compared to non-Caucasian employees. Subjectively alleging that Caucasian employees were treated in a discriminatory manner without including any specific instances has no probative value, even if it is said three times.

The most specific allegation can be found in Cascone's Declaration where she complains about an instance when she was given a written warning for the way she responded to a telephone inquiry, even though Brown had left the telephone station, requiring her to answer up to six telephone lines at once. (Cascone Decl., ECF No. 44-2, ¶ 19.) Cascone alleges that although Palms and Reynoso acknowledged that Brown should have been assisting her with the phones, he was not reprimanded. (Id.) However, accepting Cascone's recitation of the incident, she and Brown engaged in different types of misconduct, so they are arguably not similarly situated to each other. Moreover, a juror could not infer from this isolated incident involving Cascone that Palms' termination of Plaintiff was motivated by Plaintiff's race. The remaining conclusory and vague allegations by these other Caucasian employees do little, if anything, to support *Plaintiff's* claim that *her* termination was discriminatory.

Plaintiff also seems to rely on the deposition testimony of Evgenia Mayvaldov ("Mayvaldov") who is Caucasian and worked at the Transplant Center under Palms. Plaintiff

---

[11] Cascone and Goldstein were not deposed by the Defendant.

asserts that Mayvaldov testified that "Caucasian employees in the Transplant Center found it 'difficult' to work with Palms and were having a 'hard time.'" (Pl.'s Mem., ECF No. 44-1, at 13.) However, Mayvaldov specifically denied witnessing or hearing about any racial discrimination in the Transplant Center. (Dulgerian Decl., ECF No. 42-3, Ex. M ("Mayvaldov Dep."), 89:16–23; see also id. 41:15–20.) Indeed, while Mayvaldov testified that Palms had a favored group of employees, that group of people *included* a Caucasian employee. (See id. 40:2–18; see also 56.1 Stmt., ECF No. 44, ¶ 250 (confirming that one of the individuals in Palms' favored group was Caucasian).) This undermines Plaintiff's blanket assertion that Palms treated all Caucasian employees poorly. Moreover, of the individuals that Mayvaldov identified as having a "hard time" with Palms, she indicated that an employee who self-identified as Asian, Tess John ("John"), had the most difficult situation. (See Mayvaldov Dep. 69:9–24, 87:13–88:14; see also Pl.'s Mem., ECF No. 44-1, at 13.) In any event, claiming that certain employees had a "hard time" and found it "difficult" to work with Palms is just as vague and conclusory as the allegations found in the Cascone and Goldstein Declarations and thus have little-to-no probative value regarding the motivating factors behind *Plaintiff's* termination.

### iv. The Purported Race Disparity Regarding New Hires and Departures

Attempting to salvage her unimpressive evidence of purportedly differential treatment at the Transplant Center, Plaintiff identifies several Caucasian Transplant Center employees who she says were either terminated or transferred out of the Transplant Center because of Palms' racial animus. (Pl.'s Mem., ECF No. 44-1, at 13–14.) She also asserts that Palms hired five new employees in the year after Plaintiff was terminated, all of whom were non-Caucasian, including filling Plaintiff's position with a non-Caucasian person. (Id. at 14.) While the bare statistics might look probative, upon a closer look, the evidence either fails to support, or directly refutes, Plaintiff's discrimination claim.

First, the raw numbers do not support any inference about Palms' intent. Indeed, the fact that only 15 employees reported to Palms and Reynoso during the relevant time-period is too small of a sample-size to draw any inferences. See Vuona v. Merrill Lynch & Co., 919 F. Supp. 2d 359 374–75 (S.D.N.Y. 2013) (finding sample size of 28 employees counseled against heavily weighting the statistical evidence that all female trainees were terminated). Moreover, there is no information about the qualified labor pool to assess the potential discriminatory nature of the hiring decisions. See Lomotey v. Connecticut-Dep't of Transp., 355 F. App'x. 478, 481 (2d Cir. 2009) (finding that in a Title VII failure to promote case "evidence that only Caucasians were selected for these placements amounts to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination"). Furthermore, Plaintiff has not presented any expert analysis that concludes that the numbers have any probative value. See Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 515–16 (S.D.N.Y. 2010) (finding that "incomplete and anecdotal" statistical evidence without expert analysis cannot defeat summary judgment).

Outside the bare statistics, Plaintiff includes no context about the hiring decisions that could suggest any of them evince racial discrimination. Moreover, based on the minimal record about the new-hires, two of the five individuals Plaintiff identifies are Asian, which is not one of the races Plaintiff asserts Palms (and Reynoso) favored. (Pl.'s Mem., ECF No. 44-1, at 14.) And even Plaintiff's assertion that she was replaced by someone outside her protected class holds little-to-no weight because she was not directly replaced by an individual outside her protected class. After Plaintiff was terminated, a Nurse Coordinator named Barbara Wrynn ("Wrynn"), who is Caucasian, performed the outreach activities for the Transplant Center for approximately six months. (Rule 56.1 Stmt., ECF No. 44, ¶¶ 283–85.) It was not until June 14, 2015 that Northwell

hired Myra Burks-Davis ("Burks-Davis"), who is Black, to fill the position of Manager, Marketing and Education. (Id. ¶¶ 286–87.) Moreover, Burks-Davis was a longtime friend of Palms and "nepotism is not actionable under the federal anti-discrimination statutes."[12] Washington v. Garage Mgmt. Corp., 2014 WL 2989947 at *9 (S.D.N.Y. July 1, 2014). (See Rule 56.1 Stmt., ECF No. 44, ¶ 288.)

The details surrounding the departures of other Caucasian employees further diminish any probative value from the raw numbers. Plaintiff alleges that three Caucasian employees—Patricia Deflorio ("Deflorio"), Mayvaldov, and Wrynn—transferred because of Palms' discrimination.[13] (Pl.'s Mem, ECF No. 44-1. at 13.) She also refers to a Caucasian per diem employee to whom Palms purportedly stopped assigning work. (Id.) In addition, Goldstein indicated that she voluntarily transferred, and Cascone alleges that she was terminated from, the Transplant Center due to Palms' racial animus. (Goldstein Decl., ECF No. 44-3, ¶¶ 48–53; Cascone Decl., ECF No. 44-2, ¶ 48.) However, the undisputed facts behind these departures are revealing. Both Deflorio and Mayvaldov were deposed by Plaintiff, but nothing in their deposition testimony in any way suggests that Palms harbored any racially discriminatory animus towards them or other Caucasian employees. To the contrary, Mayvaldov denied ever witnessing racial discrimination at the Transplant Center and Deflorio testified that she felt pressured to leave by Dr. Ali, *not* Palms. (Mayvaldov Dep. 41:15–20; 89:16–23; Levy Decl., ECF No. 44-4, Ex. 3, 9:18-10:20.) Moreover,

---

[12] Plaintiff asserts that Burks-Davis was not qualified for the position because she did not have a valid New York State driver's license, which was a listed requirement in the job posting. (Pl.'s Mem., ECF No. 44-1, at 14 n.10; Levy Decl., ECF No .44-4, Ex. 19.) While Palms confirmed, at her deposition, that Burks-Davis did not have a *New York State* driver's license, she stated that Burks-Davis "was from New Jersey" and "[s]he had a vehicle." (Id. at Ex. 5, 348:19–349:9.) It strains credulity to contend that the provenance of Burks-Davis' driver's license could allow a reasonable juror to question the motivation behind *Plaintiff's* termination.

[13] Plaintiff also alleges that a Caucasian Pharmacist transferred out of the Transplant Center after being targeted by Palms, but acknowledges that this woman reported to a different Department and fails to provide anything other than a conclusory assertion that the individual left because of Palms—there is no deposition or declaration from this individual. (Pl.'s Mem., ECF No. 44-1, at 13–14, 14 n.9.)

there is no declaration or deposition testimony from either Wrynn or the per diem employee. Accordingly, there is no admissible evidence that they left because of Palms—the only support comes from the subjective assertions by Plaintiff and Goldstein that these employees left because of Palms. Further, Goldstein reported to another department, only had a dotted reporting line to Palms, and her Declaration fails to allege that *she* was subject to any specific differential treatment that a reasonable jury could find was in any way be connected to her race.[14] (Pl.'s Mem., ECF No. 44-1, at 14 n.9; Goldstein Decl., ECF No. 44-3.). This leaves Cascone's termination, and her allegations alone are not probative of Palms' discriminatory intent towards Plaintiff, particularly as Cascone makes many of the same conclusory-type assertions as Plaintiff. See Baby, 2017 WL 3278901, at *7 (finding that reliance on weak evidence of pretext and the circumstances surrounding the forced resignation of only one other employee in the same protected class is insufficient to defeat summary judgment).

Finally, even when considering all the evidence raised by Plaintiff together, she has failed to show "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to fire [Plaintiff] was based, at least in part, on" her race. Holcomb, 521 F.3d at 141.

## C. The Parties Must Submit Further Briefing Regarding the Purported Extension of Plaintiff's Probationary Assessment Period

Plaintiff alleges that she suffered a second adverse action—an extension of her probationary assessment period. (Pl.'s Mem., ECF No. 44-1, at 5–6.) She claims that Palms improperly extended her probationary assessment period beyond December 30, 2014, six months

---

[14] Goldstein's Declaration focuses almost exclusively on the vague and conclusory allegations regarding the general "treatment" of Caucasian employees discussed above. The only section where she discusses Palms' treatment of her directly has no cognizable connection to her race, other than another conclusory assertion that Palms did not appreciate her work because of "animus against [her] due to her race." (See Goldstein Decl., ECF No. 44-3, ¶¶ 49–54.)

after she transferred to the Manager, Marketing and Education position. Northwell denies that Palms extended Plaintiff's probationary assessment period because Northwell claims that it does not have a strict six-month assessment period. (Def. Reply Mem., at 7–8.) Northwell instead contends that its probationary period was "approximately six months," but was not complete until the employee's supervisor met with them to discuss the outcome of the assessment. (Id.) Thus, since Palms never met with Plaintiff to discuss the outcome of her probationary assessment period, Defendant argues that it could not have been extended.

Northwell's Employee Handbook indicates that new hires "must successfully complete a six-month assessment period from the start date in [their] new position. . . . At any time during the assessment, [their] manager will determine whether to extend [their] assessment period and continue [their] employment or to terminate [their] employment." (Sealed Nichols Decl., ECF No. 43-3, Ex. A, at 13.) Northwell's Policy and Procedure Manual (the "Manual") further discusses the probationary assessment period, specifying that it applies to all newly hired and transferred employees.[15] (Id., Ex. G) The Manual indicates that prior to the end of an assessment period, an employee's manager is notified to complete a performance review and then reviews the completed performance appraisal with the employee. (Id.) The manager can decide to extend an employee's assessment period in consultation with Site Human Resources and "is required to document the justification and plan of action to be carried out during the extension period." (Id.) Accordingly, it is undisputed that, during the assessment period, a manager can meet with an employee and

---

[15] The Manual does not include a specific length for the probationary assessment period, but a reasonable jury could question Northwell's assertion that the Employee Handbook's reference to a six-month period only applies to new hires. (See Def. Reply Mem., at 7–8.) Plaintiff asserts in her 56.1 Statement that "Northwell's standard probationary assessment period is six months." (56.1 Stmt., ECF No. 44, ¶ 26.) And even Nichols, in her Declaration, indicates that the probationary assessment period for newly hired *and* transferred employees is usually around six months. (Sealed Nichols Decl., ECF No. 43-3, ¶ 22.) Northwell's claim that the timeline for an assessment period was different whether the employee was a newly hired or transferred employee is thus questionable and a reasonable jury could find that Northwell's probationary assessment period was six months for new hires and transferred employees.

formally extend their probationary assessment period. The Manual does not contemplate what happens should a manager not complete the performance review within the six-month assessment period. However, there is no evidence that, in such a circumstance, an employee's probationary assessment period would simply expire at the end of six-months. Thus, it appears an employee's probationary assessment period would continue, or be de facto extended beyond the contemplated six-month timeline, until the manager completes the performance appraisal.

It is undisputed that Palms did not complete Plaintiff's performance review within six months of Plaintiff's transfer to the Manager, Marketing and Education position. Plaintiff's probationary assessment period instead lasted just over six months, from June 30, 2014, until she was terminated on January 23, 2015. Accordingly, a jury could find that Plaintiff's probationary assessment period was de facto extended by Palms' failure to complete Plaintiff's performance appraisal within six months of her transfer. The Court must then consider: (1) does this extension constitute an adverse action; (2) does Northwell have a legitimate non-discriminatory reason (or reasons) for the extension; and (3) could a reasonable juror find, by a preponderance of the evidence, that Palms' inaction was based, at least in part, on Plaintiff's race? There is minimal briefing on the extension of Plaintiff's probationary period because Defendant argued only that there was no "action" that could have been "adverse," so the parties did not fully address the issues above. Accordingly, the Court defers a ruling on this to allow the parties to submit supplemental briefing. However, the Court will briefly address the questions at issue to provide contours to the parties' supplemental briefing.

### 1. It is Unlikely that the Extension of Plaintiff's Probationary Assessment Period is an Adverse Action

The Court finds it doubtful that the extension of Plaintiff's probationary assessment period constitutes an adverse employment action because it does not appear that Plaintiff has "endure[d]

a materially adverse change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). Indeed, Plaintiff's heavy reliance on Tolbert v. Smith, 790 F.3d 427 (2d Cir. 2015), appears misplaced. The plaintiff in Tolbert was a high school teacher who, after three years as a probationary teacher, was up for a tenured position. The defendants declined to give the plaintiff tenure and instead offered him a fourth year of probation. The plaintiff refused this offer and alleged the denial of tenure was discriminatory. The Second Circuit held that "[e]xtending an employment relationship by one year by itself may not qualify as an adverse employment action. But when coupled with the denial of tenure, it is assuredly an adverse employment action." Tolbert, 790 F.3d at 436. The critical fact in this case was thus the denial of tenure.

Here, there was nothing akin to a tenured teaching position at the end of Plaintiff's probationary assessment period. Plaintiff merely alleges that her status as a probationary employee prevented her from grieving her termination. (Pl.'s Mem., ECF No. 44-1, at 6.) This is not the same kind of materially adverse change in the terms and conditions of employment as being denied a tenured teaching position. There is nothing in the record that indicates "grieving" a termination was anything more than a procedure in which Plaintiff could seek a secondary review of the termination decision. That Plaintiff could have attempted to contest a termination decision does not mean she would no longer have been an "at will" employee and does not equate to the type of "long term job security" the plaintiff in Tolbert was denied. 790 F.3d at 435. (See Sealed Nichols Decl., ECF No. 43-3, Ex. A, at 12–13, 30.)

Moreover, several district courts in this Circuit have determined that the continuation of probationary periods like Plaintiff's probationary assessment period are not adverse actions. See Smalls v. New York Hosp. Med. Ctr. of Queens, No. 13-CV-1257, 2015 WL 5437575, at *5

(E.D.N.Y. Sept. 15, 2015) (finding that a three month extension of an initial probationary period did not materially affect the terms and conditions of employment because all employees with plaintiff's title were placed on probation and "plaintiff was still paid the same amount, retained the same title, worked the same hours, and held generally the same amount of responsibility"); see also Zhao-Royo v. New York State Educ. Dep't, No. 14-CV-0935, 2017 WL 149981, at *33 (N.D.N.Y. Jan. 13, 2017) ("Plaintiff's termination constituted an adverse employment action, but [] her probationary evaluation report and her related continued employment on probationary status did not constitute adverse employment actions.").

The Second Circuit has also held, in the context of a Title VII retaliation claim, that being placed on a "performance improvement plan" or "PIP" which requires an employee to abide by certain instructions for a period of time to avoid termination, does not constitute an adverse action. Brown v. Am. Golf Corp., 99 F. App'x 341, 343 (2d Cir. 2004). Subsequent district courts have determined that even if violation of the terms of a PIP could lead to termination, if the PIP itself has no automatic material effect on the conditions of an employee's employment, it is not "materially adverse." See Gorman v. Covidien, LLC, 146 F. Supp. 3d 509, 524 (S.D.N.Y. 2015) ("Absent some indication that the PIP was an unachievable pretext to facilitate Gorman's termination at the end of its duration . . ., the mere fact that failure to abide by its terms could lead to termination does not transform the PIP into a materially adverse employment action."). The extension of Plaintiff's probationary assessment period certainly appears to be more analogous to the types of actions courts have held do not constitute adverse employment actions.

### 2. There Appears to be Non-Discriminatory Reasons for the Extension of Plaintiff's Probationary Assessment Period in the Record

If the inaction by Palms does qualify as an "adverse employment action," Defendant has not directly articulated any legitimate non-discriminatory reasons why Palms did not complete

Plaintiff's performance appraisal within six months of her transfer. However, there appears to be evidence in the record to meet Defendant's low burden of production. For example, Palms testified that she discussed the procedures to extend Plaintiff's probation with Human Resources in November or December 2014, and her understanding from that conversation was that Plaintiff's probationary assessment period would continue until Palms defined the parameters of an official extension. (Palms Dep. at 124:20–125:14.) She indicated that the reason no extension was finalized before Plaintiff's termination was that she was trying to figure out the logistics of what events were scheduled so she could determine how many to assess and the corresponding length to extend Plaintiff's probationary assessment period. (Id. at 127:2–24, see also id. at 140:2–143:10.) Accordingly, it seems likely Northwell will be able to identify legitimate non-discriminatory reasons for the de facto extension of Plaintiff's probationary assessment period caused by Palms' inaction.

### 3. It Appears Doubtful That Plaintiff Can Show the Extension of Her Probationary Assessment Period was Discriminatory

While Plaintiff alleged that the extension of her probationary assessment period was an adverse employment action in her motion papers, she failed to identify any evidence that would support that it was extended for a discriminatory reason. Indeed, her brief focused almost exclusively on why her termination was discriminatory, and as discussed in-depth in Section II.B, supra, no reasonable jury could find the combined evidence sufficient to determine Plaintiff was terminated because of her race. The Court has found no evidence related solely to the extension of Plaintiff's probationary assessment period that suggests it was in any way discriminatory, when her termination was not. However, because Plaintiff's claim concerning the extension of probation seemingly meets the low bar for a prima facie case of discrimination and Defendant did not articulate any legitimate non-discriminatory reasons for Palms' inactions in its motion papers,

Plaintiff has not yet had an opportunity to argue that the proffered reason or reasons were pretextual.

Accordingly, Defendant may submit a supplemental brief, not to exceed ten (10) pages, addressing the extension of Plaintiff's probationary assessment period based on the contours outlined by the Court, including identifying any legitimate non-discriminatory reasons for Palms' failure to complete Plaintiff's probationary assessment period within six months. Plaintiff may then submit an opposition brief, not to exceed ten (10) pages, opposing Defendant's brief. Defendant's brief is due on or before June 13, 2019 and Plaintiff's brief is due on or before June 27, 2019.

## D.  Plaintiff Has Not Established a Retaliation Claim

Finally, Plaintiff also claims that she was terminated in retaliation for complaining to Nichols about race discrimination at their meeting on January 22, 2015, the day before she was terminated. (Pl.'s Mem., ECF No. 44-1, at 24–25.) Magistrate Judge Shields recommended granting summary judgment in favor of the Defendant because Plaintiff failed to state a prima facie retaliation claim.[16] Upon a de novo review of the record and Plaintiff's objection, I agree with Magistrate Judge Shields, and adopt that portion of the R&R as the decision of the Court.

Specifically, when pressed at her deposition, Plaintiff would not verify that she actually used the terms "race," "discrimination," or "white" during her January 22, 2015 meeting with Nichols. (See Zoll Dep. 145:4–148:13.) Instead, she indicated that she was both being cautious with her language and that she might have been scared to use those words because she wasn't fired yet. (See id.) "[I]mplicit in the requirement that the employer have been aware of the protected

---

[16]  "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (internal citations omitted).

activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 15 (2d Cir. 2013) (quotation marks omitted). "The onus is on the speaker to clarify to the employer that [she] is complaining of unfair treatment due to [her] membership in a protected class and that [she] is not complaining merely of unfair treatment." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010).

Here, Plaintiff, by her own words at her sworn deposition, was not clear that she complained to Nichols about unfair treatment due to her race. Accordingly, Magistrate Judge Shields correctly determined that a reasonable jury could not find in favor of Plaintiff on any claim of retaliation because Plaintiff did not engage in any protected activity until after Northwell terminated her employment. As such, Plaintiff's retaliation claim is dismissed.[17]

### III. CONCLUSION

For the reasons stated above, Defendant is entitled to summary judgment on Plaintiff's claims that her termination was discriminatory and retaliatory. The parties may submit supplemental briefing, as outlined in Section II.C, regarding the extension of Plaintiff's probationary assessment period.

**SO ORDERED.**

Dated: May 30, 2019
Central Islip, New York

                              /s/ (JMA)
                              JOAN M. AZRACK
                              UNITED STATES DISTRICT JUDGE

---

[17] While it does not appear that Plaintiff exhausted her Title VII retaliation claim, a party need not administratively exhaust a NYSHRL retaliation claim. See Ross-Caleb v. City of Rochester, 512 F. App'x 17 (2d Cir. 2013) (noting that NYSHRL and Section 1983 Claims do not require exhaustion of administrative remedies); N.Y. Exec. Law § 297(9). Accordingly, because Plaintiff's NYSHRL retaliation claim would need to be addressed substantively in any event, the Court focuses on the merits of Plaintiff's retaliation claim.